HARVEY *v.* DETROIT FIRE & MARINE INSURANCE CO.

> 120  601
> o146 ¹711

1. INSURANCE — ACTION ON POLICY — LIMITATIONS — SUMMONS.

A claim under a policy of insurance is prosecuted within one year from the date of loss, as required by the terms of the policy, where a summons was taken out within the year, and was properly served before the return day, although it was not placed in the hands of the officer until after the year had expired.

2. MARINE INSURANCE—DATE OF LOSS—STRANDED VESSEL.

The "date of loss," within the meaning of the limitation clause of a policy of marine insurance, is not necessarily the day a stranded vessel, subsequently released, repaired, and abandoned to the underwriters, ran upon the shoal.

3. SAME—RIGHT OF ABANDONMENT—ITEMS OF LOSS.

The cost of removing the cargo from a grounded vessel in order to get it afloat should be considered as part of the loss in determining the amount lost, as decisive of the owner's right to abandon the vessel to the underwriters, and is not an expense "incurred on account of the cargo," within a clause of the policy excluding from the computation of the loss the expenses so incurred.

4. SAME—DECISION TO ABANDON—REASONABLE TIME.

Under a policy of marine insurance providing that the right to abandon shall not exist unless the loss exceeds one-half the valuation expressed in the policy, the owner of a vessel which has been aground, and has been floated by the underwriters, is entitled to a reasonable time in which to gather information and make up his mind as to whether he has, and whether he wishes to exercise, the right.

5. SAME—PROPORTIONATE RISK.

Abandonment to an underwriter of the proportion of a vessel which the amount of risk assumed by his policy bears to the value of the vessel expressed therein is sufficient, under the requirement of the policy that the abandonment convey an unincumbered and perfect title to the subject abandoned

Error to Wayne; Carpenter, J. Submitted January 6, 1899. Decided July 11, 1899.

*Assumpsit* by Fred C. Harvey against the Detroit Fire & Marine Insurance Company on a policy of insurance. From a judgment for plaintiff, defendant brings error. Affirmed.

*Moore & Goff*, for appellant.

*Wisner & Harvey* and *George Gartner*, for appellee.

MOORE, J. This is an appeal by the defendant from a judgment obtained against it by the plaintiff upon an insurance policy issued by defendant. The plaintiff, who resides in Detroit, was the owner of the schooner Penokee, which had a valuation, stated in the policies hereafter mentioned, of $4,050. The plaintiff applied to defendant for insurance. Policies were delivered to him June 10,

1896, insuring the body, tackle, apparel, and other furniture of the schooner Penokee in the following amounts, viz. : ˙

| | |
|---|---:|
| Detroit Fire & Marine Insurance Co., defendant | $1,200 |
| Providence-Washington Insurance Co. | 500 |
| St. Paul Fire & Marine Insurance Co. | 500 |
| Greenwich Insurance Co. | 500 |
| Total | $2,700 |

October 26, 1896, the schooner stranded on a reef or shoal near Port Maitland, about 45 miles from Buffalo and 235 miles from Detroit. She was loaded with coal, bound to Toledo. The same day the owner and the defendant learned of the disaster, and the plaintiff started an expedition to her relief from Detroit, while the insurance companies started one from Buffalo. Each protested against the other sending an expedition. The plaintiff notified the defendant that he would not share in the expenses of its expedition. The defendant made the same statement in relation to the expedition sent out by the plaintiff. The Buffalo expedition arrived at the schooner first. About 200 tons of coal were taken from the Penokee, after which she was pulled from the shoal and towed to Buffalo, arriving there on the evening of October 30th. She was placed in a dry-dock, and temporary repairs put upon her. She was afterwards permanently repaired by the underwriters, and tendered to plaintiff in March, 1897. December 24, 1896, the plaintiff notified the underwriters that he elected to abandon the schooner to them, as a total constructive loss, and should look to them for the amount of the insurance policies. The valuation of the vessel was fixed by the policy at $4,050. As already stated, she was insured for $2,700. It is the claim of the plaintiff that he was a co-insurer to the amount of $1,350. When he decided to abandon the vessel, he tendered a conveyance to the underwriters of the following interests in the vessel: To the defendant, 24-81; to each of the other three companies, 10-81,—retaining in himself 27-81.

A good many assignments of error are alleged. The case was tried by jury before Judge Carpenter; the judge reserving the right to enter a judgment for defendant later, if he was satisfied that, as a matter of law, he should do so. Afterwards a motion for a new trial was made, which was overruled. The case was very carefully tried, and it will not be necessary to refer to some of the assignments of error, though they have been carefully considered.

The important questions in the case are four in number:

*First.* Was the claim of plaintiff prosecuted in time?

*Second.* Was the plaintiff entitled to abandon the vessel as a total constructive loss?

*Third.* Did plaintiff give notice of his intention to abandon soon enough?

*Fourth.* Did the plaintiff tender to the underwriters a conveyance of a sufficient interest in the vessel?

The answer to the first question will depend upon the construction to be placed upon the following clauses in the policy:

"Losses shall be payable in sixty days after proof of loss or damage covered by this policy, and of the amount thereof, and of the interest of the insured, shall be made and presented at the office of said company (the amount of the premium or note for premium on this policy, if unpaid, and all other indebtedness due this company, being first deducted).

"It is agreed that this policy shall become void if any other insurance is or shall be made upon the vessel interest hereby insured, which, together with this insurance, shall exceed the sum of twenty-seven hundred dollars.

"It is agreed that all claims under this policy shall be void unless prosecuted within one year from the date of loss."

The proof of loss was made December 24, 1896. This suit was commenced by summons, which was issued October 26, 1897, returnable November 16, 1897, which was placed in the hands of the sheriff November 12th, and was personally served upon the defendant before the return day mentioned therein. It is the contention of the

defendant that, as the summons was not placed in the hands of the sheriff until more than a year after the vessel was stranded, the claim was not prosecuted within one year from the date of loss. The circuit judge construed this clause to permit suit to be brought within a year after the cause of action accrued, and held that the cause of action did not accrue until 60 days after proof of loss was furnished. If the contention of the defendant is true, when did the loss occur? In case of a fire or a death, there is not much trouble in deciding when the loss happened. There is more difficulty in a case of this character. Did the loss occur when the steamer first struck the reef, or next day, or when the hull was run into the dry-dock and the water was pumped out? What is meant by the requirement that the claim shall be prosecuted within one year from the date of loss? Is this the same as a requirement that claimant shall commence his suit within a year? The defendant gives an affirmative answer to the last question, and says the suit was not commenced until the summons was put into the hands of the officer to serve; citing *Howell* v. *Shepard,* 48 Mich. 472; *First National Bank* v. *Dwight,* 83 Mich. 191; *Peck* v. *Insurance Co.,* 102 Mich. 52; and other cases. None of these cases are directly in point, and, so far as the case of *Peck* v. *Insurance Co.* bears upon the question, it is more favorable to the plaintiff than defendant. In the case at bar the summons was taken out in time, with a proper return day; it was put in the hands of a proper officer for service during its life, and was actually served before the return day. In the cases cited, the writs were either allowed to die, without service, and without being put in the hands of an officer, or were not issued until the statute of limitations had begun to run. What was done here comes within the rule as stated by Justice MONTGOMERY in *Peck* v. *Insurance Co., supra:* "The commencement of suit consists of suing out the summons, and delivering or transmitting it to an officer, with the *bona fide* intention of having it served." I do not understand that not

only must the summons be taken out, but it must be given to an officer and served, before the statute of limitations begins to run, to constitute the commencement of a suit; but it will be sufficient if the summons is taken out before the statute begins to run, with the *bona fide* intention of having it served, and placing it in the hands of an officer and having it served during its life. Angell on Limitations (section 312) says:

"The general rule appears to be, in this country, that at the time of suing out of the writ the action commences; and either when the writ is delivered to the sheriff or to his deputy, or when it is sent to either of them, with a *bona fide* intention to be served upon the defendant, it is considered to have issued."

See *Chicago, etc., R. Co.* v. *Jenkins*, 103 Ill. 588.

In construing what the words in the policy mean, it may be well to consider other provisions of the policy. One of its provisions is, there shall be no liability should the vessel be grounded in certain localities, where the known shallowness of the water is such that the grounding would be likely to occur in navigating that locality. Should the vessel go ashore in such a locality, though the owner would suffer great loss, he would have no claim against the underwriters, and, within the meaning of the policy, there would be no loss. The grounding of a vessel is not sufficient, of itself, to create a liability. It is the getting of her off, the floating her, and getting her to a place of safety, that makes a loss for which there is a liability to pay. Another provision of the policy requires the owner, in case of loss or misfortune, to give the underwriters prompt notice; and the insured is required to do what he can to recover and save the property, submitting his plans to the underwriters. Another provision provides that no partial loss or particular average shall in any case be paid unless it equals 11 per cent. of the valuation. It is evident that the question of loss does not depend upon the vessel going aground, but upon the expense of getting her off and getting her repaired. As we shall see later,

there can be no right of abandonment unless the loss exceeds 50 per cent. of the valuation of the vessel as stated in the policy. Until there is a right of abandonment, there can be no claim for total constructive loss, and this cannot be determined until it is known what the expenses are. Another clause of the policy provides, "Losses shall be payable in sixty days after proof of loss or damage covered by this policy, and of the amount thereof, and of the interest of the insured, shall be made and presented at the office of the company." We do not discover from the policy when this proof of loss must be made. Taking all the other provisions of the policy in connection with this particular provision, it is evident the question when suit must be brought is a difficult one to answer. Intelligent men may differ as to its meaning. The language used in the policy was prepared by the insurance company. Where the language is ambiguous, it is to be construed most strongly against the company. See *Steel* v. *Insurance Co.*, 2 C. C. A. 470, 51 Fed. 722, and the many cases there cited. We think the claim was prosecuted in time. See authorities collated in the case just cited.

The answer to the second question will be determined by construing this clause in the policy:

"The right to abandon as for a constructive total loss shall not exist unless the loss exceeds one-half of the valuation expressed in this policy. In determining the amount of the loss, there shall be deducted therefrom the deductions from repairs provided in this policy; and in no case shall any amount be included, in determining such loss, for which the vessel or the insured would be liable in general average, beyond the vessel's proportion in general average of the cost of recovering and taking her to the port of repair, and the cost of repairs, with such deductions; and, among other things, there shall be excluded from the loss the vessel's proportion of all expenses and sacrifices by jettison, and sacrifices of, or expenses incurred on account of, the cargo, or any part thereof; nor shall detention by the season, or by any other cause, be alleged or allowed as cause for abandonment."

The following portion of this clause had been used in

policies but a short time: "Among other things, there shall be excluded from the loss * * * expenses incurred on account of the cargo, or any part thereof." The adjuster of the company, with his 12 years of experience, testified that he never had been called to adjust a loss where such a clause was in the policy. In wrecking the vessel, 200 tons of coal were taken from her, and transferred to a barge. It is contended by defendant this was "an expense on account of the cargo," and cannot be considered in deciding whether the loss exceeds one-half of the valuation expressed in the policy, so as to give the owner the right to abandon for a constructive total loss. It is claimed by counsel that the policy excludes (1) that proportion of the expenses incurred on account of the cargo which would, under general average, be chargeable to the vessel; (2) all expenses incurred solely on account of the cargo. It is this provision of the policy which is to govern the disposition of the items of expenditure in this case. It is said that, if the expenditures are disposed of upon this basis, the vessel's proportion of the expenses is not sufficient to make its loss exceed one-half the valuation of the vessel, thereby making a constructive total loss. In overruling a motion for a new trial, the learned trial judge disposed of the claim of counsel in these words:

"The most difficult problem in this case is to determine what general average expenses shall be considered. The policy provides, 'and in no case shall any amount be included, in determining such loss, for which the vessel or insured would be liable in general average, beyond the vessel's proportion in general average of the cost of recovering and taking her to the port of repair, and the cost of repairs; * * * and, among other things, there shall be excluded from the loss the vessel's proportion of all expenses and sacrifices by jettison, and sacrifices of, or expenses incurred on account of, the cargo, or any part thereof.' I do not think this language excludes any expense to recover or to get to the place of repair both the vessel and the cargo. Defendant concedes that the expense of pulling the vessel off the shoal should not be excluded. It is clear, though, that at least a part of this expense was

made necessary by the fact that the cargo was on the vessel.   I am unable to see on what ground this item of expense can be included, and the expense of lightering the cargo be excluded.   The language of the policy, in clear terms, includes the vessel's proportion of recovering and taking her to the port of repair.   Does not this clearly indicate that expenditures for the benefit of the vessel and cargo shall be included?   The language, 'and, among other things, there shall be excluded   *  *  *   all expenses and sacrifices by jettison, and sacrifices of, or expenses incurred on account of, the cargo, or any part thereof,' from its natural import, as well as from its connection with the language just quoted, means expenses incurred solely on account of the cargo.   An illustration of this is a charge of $12.55 for towing barge Taylor to unload coal, deducted from the Maytham Tug Line bill.   I am satisfied that I erred in excluding the charge for unloading coal. The boat could not receive the needed repairs with the cargo on board."

We are not aided in deciding whether the judge was right or not by any authorities, and the question is not free from doubt.   When the vessel went ashore, she was loaded with coal.   To release her, it was necessary to remove part of her cargo, that she might float.   Can it be said that was an "expense on account of the cargo?" After she reached port, she was leaking badly, and it was necessary to keep a pump running, to prevent her sinking. Had she filled and sunk, great expense would have been involved in raising her.   A small tug was used, which was brought to the vessel by the representatives of the underwriters who had an insurance upon the cargo. The record shows it was used for many purposes where the large tug, on account of the depth of water, was not available.   She was used in going for provisions for the men who were at work to release the vessel as well as the cargo, and in running lines from the schooner to the lighter and the larger tug.   We agree with the trial judge that, while these expenses were incurred because the cargo was in the vessel, they were not simply "expenses on account of the cargo," but were for the benefit of the vessel as well as the cargo.

Was the notice of abandonment in time? The policy does not mention any particular time in which the notice must be given. The owner is entitled to a reasonable time in which to make up his mind, and also to a reasonable time in which to get information so he can act advisedly. The testimony discloses that the insured made frequent inquiries of the underwriters for the amount of the expenses and charges, and that there was delay in obtaining these amounts. The notice of abandonment was given before the permanent repairs were made, and before a contract was given therefor. The trial judge, on the motion for a new trial, held the notice was in time, and based his holding on the case of *King* v. *Walker*, 3 Hurl. & C. 209. We think he did not err in so holding.

The clause of the policy bearing upon the fourth question reads:

"Moreover, no abandonment in any case whatever, even when the right to abandon may exist, shall be held or allowed as effectual or valid unless it shall be in writing, signed by the insured, and delivered to the said company or its authorized agent, nor unless it shall be efficient, if accepted, to convey to and to vest in the said insurance company an unincumbered and perfect title to the subject abandoned. The valuation of said vessel expressed in this policy shall be considered the value in adjusting losses under this policy."

It is claimed by defendant that plaintiff, instead of tendering a conveyance of 24-81, should have made a tender sufficient to convey to and vest in the insurance company an unincumbered and perfect title. Counsel argue, "The insurance covered the whole body of the schooner, and the abandonment should be co-extensive with the subject insured;" citing *The Mary E. Perew*, 15 Blatchf. 58; *The Manitoba*, 30 Fed. 129. The authorities are not free from conflict. If the contention of defendant is true, before plaintiff could make an abandonment which would entitle him to recover of the defendant, he must make a conveyance which would cut off his right to recover from

the other underwriters who had policies on the vessel. It was the opinion of the trial judge that:

"The provision in the policy requires that the abandonment shall be evidenced by a written transfer, which shall convey to and vest in the insurance company an unincumbered and perfect title to the subject abandoned. The 'subject abandoned,' in my judgment, means that part of the property covered by the policy of insurance."

This conclusion is justified by 2 Phil. Ins. § 1490; 2 Arn. Ins. 953, 956, 979; *Rice* v. *Cobb*, 9 Cush. 302; *Phillips* v. *Insurance Co.*, 11 La. Ann. 459; *Merchants', etc., Ins. Co.* v. *Duffield*, 2 Handy, 122; *Cincinnati Ins. Co.* v. *Duffield*, 6 Ohio St. 200 (67 Am. Dec. 339). See *Insurance Co. of North America* v. *Johnson*, 17 C. C. A. 416, 70 Fed. 794; *The Potomac*, 105 U. S. 630.

The judgment is affirmed.

MONTGOMERY and LONG, JJ., concurred. GRANT, C. J., and HOOKER, J., did not sit.